IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JAROMIR KOVARIK**<br>    Plaintiff<br><br>             -against-<br><br>**GROUNDWATER &**<br>**ENVIRONMENTAL SERVICES, INC.**<br>**and ENERGY TRANSFER**<br>**OPERATING L.P., and SUNOCO**<br><br>    Defendants | **DOCKET NO._____**<br><br>**CIVIL ACTION**<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

The Plaintiff, Jaromir Kovarik ("Mr. Kovarik") files this Complaint against the Defendants, Groundwater & Environmental Services, Inc. ("GES"), Energy Transfer Operating, L.P. ("ETO"), and Sunoco Pipeline, L.P. ("SPLP"), and alleges as follows:

**Nature of the Action**

1.  This action arises under the Pipeline Safety Improvement Act ("PSIA") 49 U.S.C. §60129, 29 C.F.R. 1981.100 *et seq*., and any other regulations deemed applicable by DOL/OSHA.

2. Mr. Kovarik claims that he has been wrongfully terminated in retaliation for reporting improperly investigated and surveyed enlarging depression directly above an old active Mariner East 1 pipeline in a close proximity to Mariner East pipeline ("ME2") currently under construction[1].

## Jurisdiction and Venue

3. This Court has jurisdiction over this action pursuant to 49 U.S.C. §60129(b)(3)(D)(i) because the Secretary of Labor has not issued a final decision by this date that is more than 210 days after the date on which the complaint was filed with OSHA, to with on August 6, 2020, and the delay has not been due to the bad faith of Mr. Kovarik.

---

[1] Mariner East 2 pipeline project was divided into several numerically designated sections/spreads. Spread 6 was the last one before terminus at Marcus Hook. The construction included two new gas lines (ME2, resp. ME2X) mostly parallel to the about hundred (100) years old existing and active Mariner East 1 natural gas pipeline also owned and operated by ETO/SPLP. The project has also been known as the Pennsylvania Pipeline Project ("PPP").

4.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) (2) because a substantial part of the events giving rise to the claim occurred in East Goshen Township, Chester County, Pennsylvania.

## **The Parties**

5.   Plaintiff, Mr. Kovarik, is an individual living at all times relevant hereto at 211 Ridge Road, Annville, Pennsylvania, 17003.

6.   Mr. Kovarik has been dully licensed as a Professional Geologist ("PG") in Pennsylvania at all times relevant hereto.

7.   Mr. Kovarik is licensed, certified or recognized as a PG and/or professional engineer (PE), and an expert on hydrogeology, subsurface conditions related to water/groundwater movement and stabilization of ground, subsidence and landslides in countries so varied as Germany, New Zealand, Czech Republic, Kuwait or the United States of America.

8.   Mr. Kovarik has an extensive international experience in geotechnical and hydrogeological inspections on multimillion dollar projects exceeding forty years and spanning over numerous countries and several continents.

9.  Among other projects, he worked as a professional hydrogeologist expert on the world largest ground stabilization project in New Zealand (Clyde Power Project) investigating and consulting on stabilization of hundreds of miles of landslides, subsidence areas, and depressions associated with construction activities.

10. Mr. Kovarik participated as a hydrogeological expert in scientific and research projects inspecting, mapping, and investigating origins and progressions of dry and flooded sinkholes, cavities, subsidences, depressions and similar earth features in various countries including Spain, Italy, Cuba, Tanzania, Rwanda, Burundi, Uganda, former Czechoslovakia, former Yugoslavia or Germany during and after his post-gradual studies,  .

11. Defendants knew that Mr. Kovarik has also been an attorney licensed in several states including the Commonwealth of Pennsylvania during all relevant times hereto.

12. Defendants knew that Mr. Kovarik is committed to protection of the environment and public safety.

13. Defendants knew that Mr. Kovarik will not compromise in matters involving his reputation and integrity.

14. Mr. Kovarik was employed by Defendant GES as a principal hydrogeologist in October 2017 after several interviews involving the issues discussed *supra* and *infra*.

15. Mr. Kovarik was retained as a part-time employee but successfully completed his introductory/probationary period and his workload exceeded soon over 50 hours per week with ten (10) to twelve (12) hours of daily workload.

16. Mr. Kovarik's hourly rate of $55/hour was later increased to $56/hour.

17. Mr. Kovarik was paid for overtime at 50% increased rate.

18. Mr. Kovarik was also receiving $ 40.00 daily allowance/food benefit.

19. Defendant GES' Policy and Procedure Manual defines employees with Mr. Kovarik workload as "Full-Time Employees."

20.  Defendant GES is, upon information and belief, a privately held consulting firm with numerous offices nationwide.

21.  Defendant GES headquarters are upon information and belief in New Jersey, Route 34, Suite 1, in Wall Township, 07727.

22.  Defendant GES office that employed Mr. Kovarik is located at 440 Creamery Way, Suite 500, in Exton, Pennsylvania, 19341.

23.  Defendant GES assisted Defendants ETO/SPLP with the installation of ME2 resp. ME2X pipeline project construction on Spread 6 ("project") at all relevant times as a contractor or subcontractor.

24.  Defendant GES' assistance included supplying licensed Professional Geologists and Hydrogeologists ("PG"), including Mr. Kovarik, to Defendants ETO/SPLP for the project.

25. Mr. Kovarik was directed by Defendants GES, ETO/SPLP agents and contractors to perform variety of field and technical support activities, PG inspections, and to compose and file PG reports during the ME 2 construction.

26. The particular employment activities performed by Mr. Kovarik included, *inter alia*, monitoring, observing and reporting on the aspects of the area in which the pipeline is located, including climatic and geologic conditions and soil characteristics and pipeline construction activities.

27. Mr. Kovarik's reports, among other things, have been relevant to identification of potential threats to pipeline integrity relevant but not limited to outside force damage while considering geology and soil stability of the area as per 49 CFR 192.917 and relevant law.

28. Mr. Kovarik's employment activities also included monitoring, observing and reporting on the proximity and developments of the area in which the pipeline is located to environmentally sensitive areas.

29. Mr. Kovarik's employment activities further included monitoring, observing and reporting the population patterns of the area in which the pipeline is located.

30. Mr. Kovarik was explained that his investigations, observations, and reporting are directly related to Defendants duty not to violate pipeline safety laws, environmental laws including the Clean Streams Law ("CSL"), the Clean Water Act ("CWA"), construction permits and court orders and stipulations.

31. Mr. Kovarik understood that his presence, and presence of other PG's on the project, was a direct result of a court order and settlement to protect public health and safety and to protect the environment during the ME2 construction.

32. Defendant GES has been at all relevant times a contractor or subcontractor to the owner or co-owner of ME2 project, to wit to Defendants ETO/SPLP.

33. Defendant ETO is, upon information and belief, a publically traded entity[2] incorporated under the jurisdiction of Delaware with its corporate headquarters at 8011 Westchester Drive, Suite 600, Dallas, Texas, 75255.

34. Defendant ETO has been known and/or operate/d, upon information and belief under numerous different names, and/or through numerous holding and similar

---

[2] Common units are listed on the New York Stock Exchange LLC under the symbol "ET."

entities and/or subsidiaries using different designations including, but not limited to: Energy Transfer, L.P., Energy Transfer Equity, Energy Transfer Partners, Sunoco LP, Sunoco Logistics, Sunoco Logistics Partner Operations L.P. ("SPLP"), Sunoco Pipeline an Energy Transfer Company, Sunoco Pipeline, L.P., and other.

35.  Upon information and belief, Sunoco Logistics owned and operated Defendant SPLP prior to April 28, 2017, when Defendant ETO and Sunoco Logistics merged.

36.  Defendant ETO established its office for the "Energy Transfer Mariner East Pipeline Project" at 525 Fritztown Road, Sinking Spring, Pennsylvania, 19608.

37.  Defendant ETO has been at all relevant times owner and/or co-owner and operator of ME2 pipeline facility.

38.  In the alternative, Defendant ETO has been at all relevant times a contractor or subcontractor to the owner or co-owner of ME2 pipeline facility.

39.  Defendant ETO lists Mariner East pipeline project as one of its assets.

40. Defendant ETO admits to ownership of Mariner East Pipeline on numerous publically available websites.

41. Defendant ETO requested Defendant GES to remove Mr. Kovarik from a job site on ME 2 project in writing before his termination by Defendant GES.

42. The Occupational Safety and Health Administration ("OSHA") determined that Defendant ETO has been Mr. Kovarik's "employer" within the meaning of the Pipeline Safety Improvement Act ("PSIA") 49U. S. C. §60129 in its June 15, 2023 Findings.

43. Defendant ETO personnel has been closely involved in overseeing and managing the construction of ME2 at all relevant times.

44. Defendant ETO's personnel, *inter alia,* certified Mr. Kovarik's compliance with the Environmental Compliance Training Program for ME 2.

45. Upon information and belief, Defendant ETO owns controlling interest in Defendant SPLP.

46.   Defendant SPLP obtained permits for the construction of ME2 pipeline facility.

47.   Upon information and belief, Defendant ETO was a co-permittee.

48.   Defendant SPLP responded to Plaintiffs complaint with OSHA claiming and admitting that SPLP has been Mr. Kovarik's employer instead of Defendant ETO.

49.   Defendant ETO's counsel subsequently stated that responses to Mr. Kovarik's complaint to OSHA should be considered as submitted on behalf of both ETO and SPLP Defendants.

50.   Defendant ETO and SPLP designations have often been used interchangeably and/or concurrently during the ME2 project.

51.   Defendant GES's witnesses acknowledged that the relationship between Defendants ETO and SPLP has been confusing and not clear.

52. Defendant SPLP has been criminally charged by the Commonwealth of Pennsylvania for false reporting and violations of Pennsylvania Department of Environmental Protection ("PADEP") permits and violating both CWA and CSL.

53. Defendant SPLP did not contest the charges thus becoming a criminally convicted entity in Pennsylvania.

54. Mr. Kovarik participated and assisted Pennsylvania Attorney General in prosecuting the criminal case against Defendant SPLP by providing information about Defendants GES, ETO and SPLP conduct.

55. Upon information and belief, Defendant SPLP has been at all relevant times owner and/or co-owner and/or operator of ME2 pipeline facility.

56. In the alternative, upon information and belief Defendant SPLP has been at all relevant times a subcontractor to the owner or co-owner and/or operator of ME2 pipeline, to wit Defendant ETO.

57. In the alternative, upon information and belief Defendant ETO has been at all relevant times a subcontractor to the owner or co-owner and/or operator of ME2 pipeline, to wit Defendant SPLP.

58. Upon information and belief agreement and/or agreements existed at all relevant times about ownership and/or operation of ME2 pipeline facility and project execution between Co-Defendants ETO and SPLP.

59. Upon information and belief Defendant GES was a beneficiary of a very lucrative monetary agreement and/or agreements that existed at all relevant times between Co-Defendants GTS, ETO and/or SPLP.

60. The fact that Defendant GES was at all relevant times an employer of Mr. Kovarik for the purposes of this PSIA action has never been disputed.

61. The fact that Defendant ETO was at all relevant times an employer of Mr. Kovarik has been established by OSHA investigation.

62. The fact that Defendant SPLP was at all relevant times an employer of Mr. Kovarik for the purposes of this PSIA action has never been disputed.

**Mariner East 2/2x Pipeline Project Background**

63. Approximately between 2017 and 2022, Defendants ETO and SPLP (collectively referred to herein as "Defendants ETO/SPLP") were engaged in the construction of a twin-set of new pipelines through Pennsylvania, including Chester County, referred to as the Mariner East 2 and 2X pipeline project (collectively referred to herein as "ME2", or "ME2 pipeline facility" or "project").

64. The completion of the project has been seriously delayed.

65. Every day of delay cost Defendants ETO/SPLP significant amount of money.

66. Defendants ETO/SPLP had strongest incentive to avid work stoppage or construction slowdown for any single day.

67. Upon information and belief Defendants' desire to keep project moving forward at any cost was at least a contributing factor to Defendant SPLP's criminal conviction in Pennsylvania.

68. The ME2 project pipelines were to be installed in designated easements and "Right of Way" ("ROW") that were supposed to be properly marked on all relevant drawings, maps and relevant permit documentation/permit plan sheets and staked out on ground surface.

69. American Petroleum Institute's ("API") Recommended Practice ("RP") 1162, which has been incorporated by reference into the Code of Federal Regulations ("CFR") defines in its paragraph 1.3.16 Pipeline Right-of-Way as "a defined strip of land on which an operator has the rights to construct, operate, and/or maintain a pipeline. A ROW may be owned outright by the operator or an easement may be acquired for specific use of the ROW."

70. An old Defendant ETO/SPLP's owned ME1 pipeline facility ROWs, public ROWs, Penn Dot ROWs, ROWs and easements associated with other pipelines and various private areas/ROWs including parking areas of department stores,

convenience stores and gas stations were also utilized for parking, access and inspection purposes on ME2 pipeline facility.

71. To be able to construct the ME2 pipelines, Defendants ETO/SPLP were required to and did in fact obtain permits from various authorities including permits from the Pennsylvania Department of Environmental Protection ("PADEP").

72. These PADEP permits included a Water Obstruction and Encroachment Permits issued under 25 Pa. Code Chapter 105 and an Erosion and Sediment Control Permits issued under 25 Pa. Code Chapter 102.

73. Under the PADEP permits, any earth disturbance activity (such as drilling, trenching, driving, construction or any similar type of activity that disturbs the ground surface) must be performed in the "limits of disturbance" ("LOD") specified in the permit plan sheets.

74. Where a PADEP permit is necessary, the LOD definition applies to "an earth disturbance activity that involves equal to or greater than 1 acre (0.4 hectare) of earth disturbance" as specified in 25 Pa. Code Chapter 102.5(a).

75. While the Erosion and Sediment Control Plan Narrative , which is a component of the PADEP's-issued permits for the ME2 states: "During construction, all land disturbance is limited to the defined LOD," lifting dry leaves or bending grass for purposes of PG's ground inspection has never been designated as land/earth disturbance limited to LOD.

76. None of the over hundred thousand (100 000) pages of documents released by Defendants during the OSHA investigation and proceedings in front of the Administrative Law Judge ("ALJ") indicate that lifting a dry leave and bending dry grass to observe, investigate and report on a tearing wall of a small subsidence less than four (4) feet across could be interpreted as an earth disturbance in violation of NPDES permit.

77. An extensive research conducted by Mr. Kovarik, his counsel, and by his legal and geological consultants revealed that lifting a dry leave and bending dry grass to observe, investigate, and report on a tearing wall of a small subsidence less than four (4) feet across could be interpreted as an earth disturbance in

violation of National Pollutant Discharge Elimination System ("NPDES") permit[3].

78. The ME2 construction involved several methods of pipe-laying including open trenching and horizontal directional drilling ("HDD"), all methods subject to PADEP permitting due to discharges into water of the United states and incorporating numerous drawings and documents within NPDES permits constituting basis for PG inspections and reporting in accordance with the terms and conditions of such.

79. PGs, among other types of professionals, were hired to inspect the ME2 construction corridor "[t]o ensure that . . . operations are conducted in accordance with permit conditions . . . .".

80. In order to determine if the operations were being conducted in accordance with the permit conditions, PGs were responsible *inter alia* for inspecting, observing, monitoring, documenting and reporting on:

a) the method of constructing and assembling the ME 2 pipeline;

---

[3] The Clean Water Act prohibits anybody from discharging "pollutants" through a "point source" into a "water of the United States" unless they have an NPDES permit.

b) the aspects of the area in which the pipeline facility is located,

including climatic and geologic conditions and soil characteristics;

c) the proximity of the area in which the hazardous liquid pipeline

facility is located to environmentally sensitive areas;

d) the population density and residents' behavior and population

growth patterns of the area in which the facility is located

e) any issues requiring construction to stop.

81. There was not enough space for PG's parking on the project. PGs were therefore often directed to park in department stores, gas stations or just public roads or other gas pipes ROW and required to walk to the construction areas to conduct their inspections.

82. There were also fences and enclosed public property on the project ROW and inspecting PGs were, therefore, directed to go around these areas on public roads or other easements.

83. The ownership and/or control over the areas that PGs had to walk over or around were often not staked or marked at all.

84. Stakes designating ROW in many areas were often removed by local residents protesting the construction of ME2.

85. In 2018, after Mr. Kovarik's truck got stuck on one of the designated access areas leading from the Styer Road parking spot and utilizing, upon information and belief, Buckeye Pipeline ROW, the access from that direction to project area has been changed.

86. The parking on the other side of the Styer Road, outside of project ROW, designated for PG inspections and observations of Marsh Creek reservoir, however, remained unchanged.

## **Procedural History**

87. On August 6, 2020, Mr. Kovarik filed a whistleblower retaliation complaint under PSIA and relevant law with OSHA against Defendants GES and ETO.

88. Mr. Kovarik's complaint was filed with the OSHA Region 3 office in Philadelphia, Pennsylvania.

89. On September 2, 2020, Mr. Kovarik reported his concerns to Pennsylvania Attorney General and other authorities.

90. On September 21, 2020 OSHA forwarded Mr. Kovarik's complaint and concerns to the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration ("USDOT").

91. On November 6, 2020, Defendant GES filed a text of its position statement with OSHA, submitting its exhibits subsequently on November 10, 2020 and served such on Mr. Kovarik on or about November 13, 2020.

92. Defendant GES position essentially boiled down to a) stating that Mr. Kovarik was removed because he went "off the LOD without seeking approval from UI, on or about May 18, 2020[4] …and included his observation of the same depression[5] in the HDD Inspection Daily Report" and b) pointing finger at ETO for retaliation against Mr. Kovarik.

---

[4] PG never required any approval from Utility Inspector (UI) to go off LOD.  Majority of the PG inspections was conducted outside of LOD and without UI knowledge or supervision.
[5] It was PGs duty to inspect and include observations of the same features and phenomena into their daily reports to allow for comparison of changes in time.

93. On November 20, 2020, Defendant ETO requested thirty (30) days extension for submitting its position papers to OSHA.

94. OSHA's letter of November 30, 2020 granted Defendant ETO an extension until January 8, 2021 to respond to Mr. Kovarik's complaint.

95. On December 7, 2020, Mr. Kovarik, based on his reporting to Attorney General's Office and interview, received Statewide Investigating Grand Jury ("Grand Jury") Subpoena to testify in investigation of environmental crimes that occurred during the installation of the ME 2 pipeline facility in the Commonwealth of Pennsylvania.

96. Mr. Kovarik was sworn-in for his Grand Jury Testimony by the Presiding Judge, together with Defendant's SPLP/ETO corporate witness, on December 15, 2020.

97. On December 23, 2020, Penn DOT on behalf of USDOT conducted excavation and investigation of the area giving rise to Mr. Kovarik's concern and reports, to wit, the subsidence above ME1 pipeline next to the ME 2 pipeline facility.

98. On January 8, 2021 Defendant SPLP submitted its position statement to OSHA.

99. Defendant SPLP's position statement asserted that SPLP is a proper Respondent/Defendant, rather than Defendant ETO in this matter[6] because Defendant SPLP was Mr. Kovarik's employer pursuant to PSIA.

100. Defendants ETO/SPLP position was based on a) fraudulent affidavit of Mr. Banach alleging that he observed multiple violations of ETO/SPLP policy by Mr. Kovarik between 2019 and his termination[7], and b) that Mr. Kovarik's did not engage in a protected activity because his reports of depression/subsidence did not relate to violations[8] of any law.

101. Defendants ETO and SPLP continued to act/respond jointly during the OSHA investigation.

---

[6] Defendants SPLP/ETO's counsel sent subsequently a letter to OSHA confirming that all of the actions/responses/communications to OSHA with respect to the pending matter by Defendant SPLP should also be attributed to Defendant ETO.

[7] Neither of these alleged violations have been supported by Defendants' 100 000 thousand documents and neither Mr. Banach, nor Defendants stated why Mr. Kovarik was still on the job until he reported defective investigation of the geological condition/subsidence on May 19, 2020.

[8] Mr. Kovarik's explanations to Ms. Fish, Mr. Banach and Mr. McBrien that he is concerned that there is a potential for explosion of ME1 if its integrity is compromised, thus violation of the pipeline safety law would be at issue, and that wetlands could be compromised if the depression/subsidence is activated and a hydrological balance of WH-31 disturbed, thus both CWA and CSL would be violated, were never addressed.

102. On February 1, 2021, Mr. Kovarik submitted his rebuttal to Defendants GES and ETO/ SPLP's position statements.

103. OSHA concluded that Mr. Kovarik satisfied the *prima facie* threshold and continued with investigation.

104. An unsuccessful mediation overseen by OSHA was conducted by all of the parties between June 29, 2021 and August 5, 2021.

105. On October 25, 2021, or shortly thereafter, the case was transferred for undisclosed reasons to OSHA Region 5 in Toledo Ohio.

106. On August 5, 2022, Attorney General Josh Shapiro announced that Defendant SPLP (and ETC Northeast Pipeline LLC, both subsidiaries of Defendant ETO), were convicted of criminal charges related to their conduct during the construction of Mariner East 2 Pipeline in Pennsylvania.

107. Defendant SPLP's criminal conduct included multiple failures to report violations of law and NPDES permits during construction activities subject to PGs' inspections.

108. Mr. Kovarik's report to Attorney general Office on September 2, 2020 and further cooperation has been related to the criminal proceedings for violation of federal and state laws and criminal conviction of the Defendant SPLP.

109. On June 15, 2023 OSHA issued its findings to the parties.

110. The June 15, 2023 OSHA findings concluded that defendant ETO has been an "employer" for the purposes of Mr. Kovarik's complaint.

111. The June 15, 2023 OSHA findings also stated that Mr. Kovarik was removed from the job site and terminated for a non-retaliatory reasons yet OSHA *failed to provide any basis for such a conclusion*.

112. It became apparent from OSHA's file that two days before the OSHA's decision has been released, Defendants convinced OSHA that Mr. Kovarik has been

terminated because he was outside of ROW and/or violated LOD, when he was investigating the subsidence with Mr. Banach and Mr. McBrien in May 2020.

113. It is unclear why would OSHA ignore, and not investigate the fact that no such claims were made, when Mr. Kovarik investigated the same depression numerous times in the past with and without Mr. Banach and Mr. McBrien, reported on the same depression, and submitted numerous photographs of such.

114. It is unclear why would OSHA ignore and not investigate the fact that no such claims were made against Mr. Banach and Mr. McBrien when they investigated the same depression with Mr. Kovarik.

115. On July 11, 2023, Mr. Kovarik timely appealed OSHA findings and requested a Hearing before an Administrative Law Judge.

116. On August 23, 2023 a Notice of Docketing Statement was issued by the Office of Administrative Law Judges ("OALJ") for the OALJ case number 2023-PSI-00004 corresponding to OSHA Case No.: 3-6540-20-131, In the matter of Jaromir Kovarik v. Groundwater & Environmental Services, Inc. (GES) and Energy Transfer Operating L.P. (ETO) ("matter").

117. On October 19, 2023, Honorable Sean M. Ramaley, the Administrative Law Judge assigned to preside over this matter ("Hon. Ramaley"), issued his Notice of Assignment, Notice of Hearing, and Initial Preheating Order ("Hon. Ramaley' s Hearing Order").

118. Hon. Ramaley' s Hearing Order designated February 6, 2024 as a hearing date with a discovery cut-off date sixty (60) days before the hearing date.

119. On November 20, 2023, Mr. Kovarik submitted his Motion for Continuance of the Hearing pursuant to 29 C.F.R. § 18.41 (b) and issuance of an order for Development of a Proposed Discovery Plan pursuant to 29 C.F.R. § 18.50 (b) et. seq ("Motion for discovery plan").

120. On November 27, 2023 was Mr. Kovarik's Motion for a Discovery Plan denied by Hon. Ramaley.

121. On December 5, 2023, Hon. Ramaley extended the discovery cut-off date to January 8, 2024 during a telephone pre-hearing conference.

122. On December 29, 2023 Hon. Ramaley issued a Disclosure Order notifying the parties of his potential conflict of interest regarding a family investment with respect to Defendant ETO and informed the parties that he will not be resolving any motions until the end of the discovery period, to wit, January 8, 2024.

123. Numerous discovery disputes including emergency motion were pending unresolved at that time and until after the discovery cut-off date.

124. On January 2, 2024, Hon. Ramaley issued an Order Canceling Hearing and a Notice of Withdrawal of Administrative Law Judge based on Hon. Ramaley's previously identified potential conflict.

125. On January 8, 2024, Mr. Kovarik renewed his Motion for Issuance of an Order for Development of a Proposed Discovery Plan pursuant to 29 C.F.R. § 18.50 (b) et. seq and for continuance of the Discovery accordingly ("renewed motion").

126. Mr. Kovarik based his renewed motion, *inter alia,* on the fact that the Defendants ETO and GES violated document production and subpoenas by their production of over 100,000 electronic files identified only by bates

numbers in a format not readily accessible/reviewable even by Defendant GES's own witnesses.

127. Mr. Kovarik estimated in his renewed motion that "[t]he current status of respondents' production would require over two hundred (200) eight (8) hours day just to review Respondents' current production" based on the testimony of Defendant GES' witnesses.

128. There have been additional unresolved disputes between the parties, including depositions of Defendants GES, ETO, and third party witnesses, in particular the deposition of Mr. Banach has not been completed, all compounded by Defendants' defective document production.

129. The discovery has been very contentious with each opposing party accusing the other party of misconduct.

130. On January 8, 2024, Hon. Administrative Law Judge Natalie A. Appetta, newly reassigned presiding judge ("Hon. Appetta") issued a Notice of Reassignment, Notice of Rescheduled Hearing and Order Providing Certain Amended Pre-

hearing Deadlines and Requirements ("Hon. Appetta's January 8 Hearing Order").

131. Hon. Appetta's January 8 Hearing Order *inter alia* stated that the "parties must complete all discovery no later than January 8", 2024, to wit by the date the order was issued and Mr. Kovarik submitted his renewed motion for extension and ordered that "[a]s discovery closes today, January 8, 2024, Motions for Summary Decisions are required to be filed by January 16, 2024, regardless of the date of the scheduled hearing" and that " [a]ny responses to Motions for Summary Decision are required to be filed eight days (8) days after the Motion has been served on the parties," thus suspending the Rule 29 C.F.R. § 18.33(d).

132. Hon. Appetta's January 8 Hearing Order further ordered that the Hearing is to be conducted on February 27, 2024 remotely[9] and directed parties to provide agreed upon dates of availability for hearing between February 13 and March 15, 2024 should a party have a conflict.

---

[9] During the pre-hearing conference on December 5, 2024, Mr. Kovarik strongly objected to a remote hearing and it was ordered by Hon. Ramaley that the Hearing will be conducted in person in Harrisburg.

133. On January 11, 2024, Defendant ETO send a letter to Hon. Appetta asserting a pre-existing non-movable conflicts during the dates of February 27-March 1, 2024, the dates Hon. Appetta scheduled for the hearing and "non-refundable out of country travel from February 24-28, 2023 [sic] that would present an undue hardship to cancel or reschedule" ("Defendant ETO letter").

134. The Defendant ETO letter proposed that "the hearing be moved to February 20-23, 2024."

135. The Defendant ETO letter stated that Mr. Kovarik does not agree with the proposed Hearing date and that he suggests that the hearing should be held in person as per December 5, 2023 pre-hearing conference with Hon. Ramaley and at later date.

136. On January 16, 2024, Defendant ETO filed two and Defendant GTO one Motion for Summary Decision.

137. Defendant ETO Motions for Summary decision were based on a) arguing that ETO is not a proper party b) that Mr. Kovarik's report was not related to any

violation of existing law; similar grounds being asserted by Defendant GES plus assertions that Mr. Kovarik was treated the same way as other employees[10].

138. On January 17, 2024, Hon. Appetta denied Mr. Kovarik's renewed Motion for Development of the Discovery Plan and Extension of Discovery and all of his motions to compel discovery and sustained all of the Defendants', resp. third party motions[11] to resist discovery and deposition.

139. On January 18, 2024, Hon. Appetta issued in Order Responding to Requests for Clarification and Rescheduling Hearing ("Clarification and Hearing Order").

140. The Clarification and Rescheduling Order, *inter alia*, overruling Mr. Kovarik's objections and rescheduling the hearing to start on February 20, 2024 to be conducted remotely.

---

[10] Upon information and belief, no employee on Spread 6 has been terminated for asserting violations of pipeline safety law and environmental laws based on defective investigation of subsidence above ME 1.

[11] The motion for issuance of subpoena for deposition of a key witness Ray Banach has been pending since December 11, resp. December 12, 2023, yet not resolved until January 17, 2024, nine days after the discovery cut-off date.

141. The Clarification and Rescheduling Order restated that Mr. Kovarik's responses to Defendants ETO/SPLP and GES Motions for Summary Decisions are due on January 24, 2024.

142. On January 22, 2024, Mr. Kovarik filed his Motion for issuance of an Order Extending Time for his Response to Respondents' pending Motions for Summary Decision to fourteen (14) days as specified by rule 29 C.F.R. § 18.33.

143. On January 24, 2024, Defendants ETO/SPLP and GES jointly opposed Mr. Kovarik's Motion for Extension of Time to respond to Defendants Motions for Summary Decision.

144. On January 24, 2024, Hon. Appetta issued an Order Extending Mr. Kovarik's Time to Respond to Respondents/Defendants' Motions for Summary Decision to January 31, 2024.

145. On January 26, 2024, Defendants ETO/SPLP and GES submitted their Joint Stipulation of Agreed Facts ("JSOF") and their individual Amended Pre-Hearing Statements.

146. Defendants JSOF has been complemented by numerous exhibits and by Mr. Kovarik's never seen affidavits of Ms. Fish and Ms. Grillo.

147. Defendants JSOF numerous supporting exhibits did not provide a single exhibit evidencing that Mr. Kovarik has been informed that the depression/subsidence in question is outside of ROW or that he violated LOD policy when inspected, observed and reported on it with or without the presence of Mr. Banach and Mr. McBrien.

148. Defendants JSOF numerous supporting exhibits did not provide a single exhibit evidencing that moving dry leaves or bending grass to observe ground and soil conditions during PG inspection constitutes a "disturbance of ground" or a similar activity restricted to LOD.

149. On January 30, 2024, parties held a settlement negotiations conference that was not successful.

150. Shortly after the conference, Mr. Kovarik filed his opposed Motion to Stay Proceedings to February 10, 2024, or until he exercises his right to file the case

in the appropriate US District Court under the kick-off provision of 49 C.F.R. § 60129 (b)(3)(D)(i) to be allowed time to prepare his complaint.

151. On February 1, 2024, Hon. Appetta issued an Order denying Mr. Kovarik's Motion to Stay as Moot and Dismissing his Complaint with Prejudice to reinstatement or refiling in the OALJ ("Order of Dismissal").

152. Hon. Appetta's Order of February 1, 2024 found that the conditions of 49 C.F.R. § 60129 (b)(3)(D)(i) have been satisfied in Mr. Kovarik's case because his complaint was filed over three (3) years ago, no final decision on the Complaint has been issued by the Secretary of Labor and, at this juncture, she did not find the delay to be due to bad faith of Mr. Kovarik.

153. On February 8, 2024, Mr. Kovarik filed his Motion to Reconsider Hon Appetta's Order of Dismissal.

154. On February 9, 2024, Mr. Kovarik filed his Notice of Appeal with the Administrative Review Board asking for reversal of the Hon. Appetta's Order of Dismissal.

155. On February 9, 2024, Hon Appetta granted Mr. Kovarik's Motion to Reconsider her Order of Dismissal reinstating Mr. Kovarik's complaint, all pending motions, deadlines and hearing date and staying the matter until 11:59 pm EST on Monday, February 12, 2024 or until Mr. Kovarik provides a copy of his complaint filed in U.S. District Court, whichever comes first.

156. Mr. Kovarik was unable to complete discovery to respond to Defendants motions for Summary decision during the proceedings in front of the Administrative Law Judge as he stated in several of his motions.

157. Hon. Appetta's orders prompted Mr. Kovarik repeatedly about his right to file the instant action in the appropriate District Court of the United states pursuant to 49 C.F.R. § 60129 (b)(3)(D)(i).

158. Based on Mr. Kovarik's experience with proceedings in front of ALJ, United States District Courts are better equipped to oversee discovery and resolve disputes in complex cases or cases where, as Hon. Appetta observed in her January 24, 2024 Order: "there is a lack of communication among the parties and an unwillingness to agree to anything".

159. Mr. Kovarik, therefore, filed his complaint in this Honorable Court on February 12, 2024 as anticipated by Hon. Appetta.

## **Claim for Retaliation and Wrongful Termination under 49 U.S.C. §60129, 29 C.F.R. 1981.100 *et seq* against all Defendants**

Mr. Kovarik incorporates the allegations of the preceding paragraphs above, and further alleges:

160. Mr. Kovarik signed Defendant GES's offer of employment on or about October 5, 2017.

161. Mr. Kovarik's starting position was Principal Hydrogeologist (P6).

162. Mr. Kovarik's starting hourly rate was $55.00/hour with overtime pay at 1.5 times his base hourly compensation for approved hours worked in excess of forty (40) hours per week.

163. While Mr. Kovarik's agreement offer stated that his is a part-time position with anticipated work up-to 2 days a week, his work extended up to five (5) days a week with an average exceeding fifty (50) hours a week soon.

164. Mr. Kovarik's employment agreement also states that Defendant GES was compensated $195/hour, upon information and belief, for seconding Mr. Kovarik to Defendants ETO/SPLP.

165. Mr. Kovarik was assigned to perform inspections as a PG on the ME 2 pipeline facility on Spread 6, which includes Chester County.

166. Defendant GES was repeatedly asking for more hours per week for work on ME 2 pipeline project and Mr. Kovarik worked up-to sixty (60) hours per weeks at certain times.

167. Defendant GES indicated that it will continue employment of Mr. Kovarik after completion of ME 2 pipeline project and requested his resume for that purpose.

168. When Mr. Kovarik informed Defendant GES that he is resigning, because he believed that he would be unable to adhere to his high professional standards, to wit being asked to complete his report before receiving relevant information, Defendant GES asked Mr. Kovarik to reconsider recognizing that Mr. Kovarik was correct and that his professional integrity is not for sale.

169. Mr. Kovarik, indeed reconsider after Defendant GES initiated certain changes.

170. Mr. Kovarik, therefore, closed his law office in May 2020, just before his termination, to be available to work for Defendant GES exclusively in the future.

171. Every day that Mr. Kovarik performed his inspection as a PG on ME 2 pipeline project, he was required to fill out a HDD inspection Daily Report and submit such to Defendants.

172. The HDD reports summarized Mr. Kovarik observations and findings during his inspections of the ME2 pipeline facility and included photographs of selected relevant areas or activities of interest or concern. On Saturday January 4, 2020, at a meeting at Spread 6 construction office to discuss "Field Support Protocol," PGs were asked to report to construction management any possible depressions or areas of concerns on the ME2 ROW or ME2 LOD.

173. After the January 4, 2020 meeting, Mr. Kovarik sent a photograph of a subsidence/depression he observed the previous day within the pipeline facility

ROW to his geological supervisor, Lead Field Coordinator and Senior PG Ms. Lieschen Fish, PG ("Ms. Fish").

174. Ms. Fish instructed not to put the subsidence/depression on his HDD daily reports.

175. The depression that Mr. Kovarik observed is located along North Chester Road, near the intersection of Bow Tree Drive along the newly constructed ME2 pipeline facility and directly above the existing active ME1 gas pipeline owned and operated by Defendants ETO/SPLP.

176. The ME1 pipeline is almost one hundred (100) years old and was constructed with lower margins of safety than required by today's law and enabled by today's technology.

177. The subsidence is also in a close vicinity to populated area of East Goshen Township, where any explosion could have catastrophic consequences resulting in loss of life and property.

178. The subsidence is also very close, if not directly within the monitored wetlands, designated as WH-31 on ME 2 permit and construction drawings.

179. It is also in the middle of the ROW for the ME1 facility owned and operated by Defendants ETO/SPLP.

180. Upon information and belief, Ms. Fish added the photo of the depression to the "depression tracker," but upon information and belief, she did not immediately report it to Defendants ETO/SPLP construction management or Environmental Inspector.

181. Ms. Fish did not inform Mr. Kovarik that the subsidence is outside of ROW at the time of his reporting or at any time in the future.

182. Mr. Kovarik has been concerned that the existing drilling activities at HDD-521 could be connected through the local faults or cracks projected as perpendicular traces to ME1 due to the geology in the area. Such connection could result in removing and/or weakling support for the active ME1 pipeline facility leading to the loss of its integrity.

183. On January 10, 2020, Mr. Kovarik, therefore, reported his continuous concern to the utility inspector at the staging area of the HDD-521 in the vicinity of the subsidence.

184. Mr. Kovarik's concerns were also shared with the Construction Manager, Mr. Ray Banach of Cleveland Integrity Services ("Mr. Banach"), the Lead Environmental Inspector, Mr. Josh Prosceno ("Mr. Prosceno") of Tetra Tech, and the Chief Utility Inspector[12].

185. Mr. Banach an Environmental Inspector, Mr. Gavin McBrien of Tetra Tech (dispatched by Mr. Prosceno), meet with Mr. Kovarik and walked the area of subsidence up the wetlands behind it.

186. Neither Mr. Banach nor Mr. McBrien or any of the surveyors were PG's.

187. Therefore, any reliance of Mr. Banach or Mr. McBrien or surveyor's conclusion on the origins and progression of the subsidence, such as suggesting it to be tire rut, would be in violation of permits and law, including attempts to practice geology without a valid license in Pennsylvania.

---

[12] Contractors retained and acting as agents apparent on behalf of Defendants ETO/GES.

188. At no time, while investigating and walking around and beyond the subsidence towards the wetlands WH-31, did Mr. Banach or Mr. McBrien suggested or indicated that the subsidence/depression was out of ROW and they or Mr. Kovarik should not be walking and investigating around it without a special permit.

189. There were no stakes on the ground suggesting that the subsidence/depression was outside of ROW.

190. None of the permit drawings/construction sheets indicated that the subsidence/depression is outside of ROW.

191. On January 10, 2020, upon information and belief, the Defendants ETO/SPLP's surveyor surveyed and investigated the depression without presence of any PG to direct what parts should be marked and surveyed.

192. PG's expertise is required to decide what parts of a subsidence/depression are most likely to move in time so survey pins and stakes are position properly for the future re-survey.

193. Mr. Kovarik's HDD Inspection Daily Report on January 10, 2020 and subsequent HDD reports reported on inspections of the subsidence/depression including photographs depicting such.

194. The above HDD reports have been submitted and reviewed by Defendants without any objections.

195. At no time did Defendants suggested or indicated to Mr. Kovarik, or to any other PG on the ME2 project, that the depression/subsidence is outside of ROW limits and should not be inspected.

196. At no time was Mr. Kovarik, or any other PG apprised that lifting dry leaves or bending grass to inspect soil and ground conditions is considered disturbance of ground.

197. In fact, it is almost impossible to inspect soil and ground conditions in grassy and wetland areas, particularly during fall with leafs on the ground.

198. On January 17, 2020, the surveyor surveyed the area again without any PG being present and reported that no changes were observed.

199. The survey stakes and marks have been removed making inspections and evaluations of the depression/subsidence survey points in the future impossible for inspecting PGs.

200. At no time were stakes or other markings placed on the ground indicating that the subsidence/depression is outside of ROW and should not be inspected.

201. On January 29, 2020, Mr. David Demko, PG, an employee of Defendant GES prepared a Pre-Pipe Pull PG Site Evaluation. Mr. Demko indicated that while the depression was determined not to be dangerous, the area would subsequently "be monitored through the upcoming pipe-pull and during the post pipe-pull inspections."

202. Nothing in Mr. Demko's report indicated that the depression/subsidence is outside of ROW and that a special permit would be required to monitor it, or that inspecting such would be in violation of Defendants ETO/SPLP's LOD policy.

203. In the subsequent months, between January 10 and May 18, 2020 (except when drilling was halted due to the Governor's COVID-19 order), Mr. McBrien regularly checked the depression area.

204. During the above time period Mr. McBrien saw and spoke with Mr. Kovarik regularly about their inspections of the depression/subsidence in question.

205. Mr. McBrien did not raise any concerns about the depression/subsidence being outside of ROW or his and Mr. Kovarik's inspections being in violation of Defendants ETO/SPLP's LOD policy at any time.

206. On May 18, 2020, Mr. Kovarik informed the Chief Environmental Inspector Mr. Josh Prosceno ("Mr. Prosceno"), Utility Inspector Mr. Jack Wallace and Ms. Fish, via text message that the "Earth feature @ 521…appears to double in size and sides are opening."

207. Mr. Prosceno responded that he would have an Environmental Inspector inspect and have the surveyor come to take measurements again.

208. Mr. Prosceno did not suggest or indicate that the depression/subsidence is outside of ROW and should not be approached by Mr. Kovarik.

209. Mr. Kovarik communication May 2018, 2020 about the depression stating that it is "not much deeper" but appears "double in size and sides are opening "has been included in parties production and exhibits.

210. Indeed, sides of the depression were steeper with opening tears and cracks as evident from comparison of Mr. Kovarik's January and May pictures.

211. Such signs quite often mean that a potentially inactive depression or dormant subsidence is evolving into an active subsidence.

212. Mr. McBrien met with Mr. Kovarik at the subsidence and walked around the subsidence as in January 2020 while waiting for Mr. Banach.

213. Mr. McBrien asked Mr. Kovarik why he is risking wrath of Mr. Banach by bringing the attention to the subsidence again.

214. Mr. Kovarik explained to Mr. McBrien that he is concerned, that the activation of the subsidence could mean that the support for the active ME1 pipeline, shown on the project drawings directly below the subsidence, could be washed away.

215. Washing away or weakening of the support around an active gas pipeline, particularly an old one, can lead to a rupture and explosion of a pipeline.

216. Rapture and explosion of a gas pipeline can have catastrophic consequences including loss of life and property, particularly in residential neighborhoods similar to one close to the subsidence in question.

217. Mr. Kovarik stated that he will rather risk wrath of Mr. Banach than loose his professional integrity and expose public to any risk or explosion as in Beaver County.

218. Mr. McBrien noted that under the circumstances, Mr. Kovarik is "doomed whether he reports the subsidence or not."

219. Mr. Banach arrived "pumped up" to the subsidence location.

220. Mr. Banach walked with Mr. McBrien and Mr. Kovarik again around the subsidence.

221. Mr. Kovarik was asked to show where the cracks and tears in the subsidence walls are.

222. Mr. Kovarik removed a few dry leaves and bent dry grass that obscured the view of the tears and cracks.

223.  He also placed his glove next to the observed features to give a scale.

224. He further explained that he had placed a rock in the subsidence for reference after the surveying stakes were removed.

225. Mr. McBrien consented that the subsidence could be a bit larger then when investigated first in January, 2020.

226. Mr. McBrien comment drew ire from Mr. Banach who insisted that the subsidence is an old tire rut.

227. Mr. McBrien did not contradict irritated Mr. Banach.

228. Mr. Kovarik disagreed and proposed that the drilling at HDD-521 should stop until the subsidence is properly surveyed and evaluated under the PG supervision, and if necessary excavated to make sure ME1 pipe is safe.

229. Mr. Kovarik also suggested that the subsidence issue should be reported to DEP to comply with the permits and law.

230. Mr. Kovarik explained to everybody that he is concerned with the underlying pipeline integrity and that not properly investigating the issue is akin to violation of pipeline safety law.

231. Mr. Kovarik's position further annoyed Mr. Banach, who stated that Mr. Kovarik's conduct is against Defendants ETO/SPLP interests, because his suggestion may lead to interruption of drilling at HDD-521 drill, further delay of the project and increased costs.

232. Interruption of drilling at HDD-521 would, indeed, most likely delay the progress of the ME2 completion further.

233. Any delay in completion of ME2 project caused significant loss of profits for Defendants ETO/SPLP, particularly because the project has already been behind the schedule.

234. Neither Mr. Banach, nor Mr. McBrien suggested to Mr. Kovarik that any of them have been outside of ROW during their walk-around and investigation or that they or Mr. Kovarik has done something in violation of LOD during the investigation.

235. It was clear that Mr. Banach will not tolerate Mr. Kovarik's opinion contrary to his one, when he left the subsidence site.

236. On May 19, 2020, Mr. Banach sent an electronic communication to Ms. Fish, Mr. Demko, Cc.: Mr. Ronald Cummings and Ms. Monica Styles, both employees of Defendants ETO/SPLP, requesting *inter alia* Mr. Kovarik "…not to be on the project."

237. Mr. Banach insisted that it became apparent that Mr. Kovarik has been re-filtrated unacceptably back into the project after trespassing on Stryker Road.

238. The incident on Stryker Road occurred in 2018.

239. Mr. Banach has been aware of Mr. Kovarik's work on the project and has been meeting with Mr. Kovarik in person and communicating with him via phone and text messages since at least June 2019.

240. Mr. Banach admitted in his affidavit, and his admission has been confirmed by affidavit of Mr. McBrien, that he met, investigated and discussed the subsidence in question with Mr. Kovarik on January 10, 2020.

241. Mr. Banach did not sent any communication about Mr. Kovarik being "infiltrated" on the project or violating LOD, as he did on May 19, 2020 *Supra*.

242. Mr. Banach's "apparent" need for immediate removal of Mr. Kovarik from the project suddenly expressed on May 19, 2020, less than 24 hours after Mr. Kovarik insisted on reporting the subsidence to authorities against his desire was therefore a pretext.

243. Mr. Banach also knew that he, Mr. McBrien and Mr. Kovarik were off LOD when walking around the subsidence because there is no LOD marked and/or designated in that area.

244. Mr. Banach knew, or should have known that lifting dry leaves and bending grass that Mr. Kovarik done on his bidding, is not disturbance of ground and hence no violation of permits and/or Defendants policy.

245. Mr. Banach's accusation in May 19, 2020 communications to Defendants that Mr. Kovarik violated Defendants' LOD rules was, therefore a pretext.

246. Mr. Banach requested removal of Mr. Kovarik from ME2 project on pretext because he disagreed with Mr. Kovarik reporting his observations of subsidence and requirements for such to be reported to the authorities and properly investigated.

247. Mr. Banach's pretext scheme was taken at a face value by Defendants because it was in alignment with Defendants' monetary interests.

248. Mr. Banach's factual allegations against Mr. Kovarik were never verified by Defendants.

249. On May 19, 2020, the surveyor surveyed the subsidence area again without presence of Mr. Kovarik, who was the PG assigned for the inspections of the area for that day.

250. Mr. Kovarik learned about the survey only from his observation of surveyor's stick within the subsidence when he was finishing one of his inspection walks, after about 5PM on May 19, 2020.

251. Mr. Kovarik inspected the subsidence and realized that the survey was not done properly or that the subsidence's wall collapsed more since the survey.

252. Mr. Kovarik immediately conveyed his observations to Ms. Fish.

253. Mr. Kovarik was removed from the job site by Ms. Fish telephone call on May 20, 2020, at about 7 am, less than fourteen (14) hours after Mr. Kovarik reported his last observation of defective survey of the subsidence in question.

254. Mr. Kovarik later learned that while the survey was not done at the proper spot, the surveyed depth of the subsidence has still been about eight tenth (0.8) of an inch *deeper*.

255. It is well known that geological processes, unless catastrophic, are not measured in days or months.

256. Deepening of a relatively small subsidence by 0.8 inches or more within a few months and steepening and tearing of its walls are signs to be taken seriously, particularly above an active gas pipeline in a vicinity of horizontal directional drilling, with local geology indicating linear features connecting the drilling area, the subsidence and wetlands.

257. Such a subsidence, even if not pausing danger to the underlying active gas pipeline, can seriously disturb the existing wetlands' ecosystem.

258. The best practices mandated by ME2 permits for such a situation require proper reporting and investigation. Such is best accomplished by stoppage of drilling, reporting of the subsidence, inspecting the subsidence through excavation and proper remediation.

259. Defendant GES terminated Mr. Kovarik by a letter dated June 8, 2020.

260. The termination letter stated that Mr. Kovarik's termination is based on electronic correspondence from Defendant ETO dated May 19, 2020 instructing Defendant GES that Mr. Kovarik is "not to be on the (ME2) project" for violation of Defendant ETO's LOD rules[13].

261. The termination letter was the first instance when Mr. Kovarik learned that there has been allegations by Defendants about his violation of LOD rules.

262. These allegations were later, during OSHA investigation and proceedings in front of ALJ, changed and/or supplemented by allegations that Mr. Kovarik violated Defendants ROW rules.

263. No exhibits supporting either allegation have been produced.

---

[13] The language strongly suggests that the Mr. Kovarik's termination is based exclusively on Mr. Banach's communication of May 19, 2020 *Supra*.

264. Defendants, therefore, lack any evidence to prove that these allegations were not just a pretext to retaliate against Mr. Kovarik's report of the subsidence and his determination to report such to the authorities.

265. Defendants knew that by not reporting and properly investigating the subsidence, they are violating the construction permits and the relevant environmental laws.

266. Defendants knew that by not reporting and properly investigating the subsidence, they are violating relevant pipeline safety laws and endangering public safety.

267. The only reason why Defendants did not stop drilling and report and properly investigate the subsidence was their monetary gain.

268. Defendants removed Mr. Kovarik from the job and terminated him because Defendants did not want Mr. Kovarik to report his concerns about their law violations to authorities.

269. Mr. Kovarik reported his concerns about Defendants violations of permits, environmental and pipeline safety laws to several authorities, including PA DEP, US DOT and Pennsylvania Attorney's Office.

270. After his reports to authorities, Mr. Kovarik received a subpoena and was sworn in to testify against Defendant SPLP in front of an Investigative Ground Jury on December 15, 2023.

271. Defendant SPLP was eventually indicted and convicted for criminal conduct in violation of permits and environmental laws.

272. On December 23, 2020, DOT conducted investigation of the subsidence in question through excavation and remediation of the site, the investigative procedure that Mr. Kovarik advocated to Defendants.

273. The DOT investigation found, *inter alia*, that water from the wetlands was running into the excavation area.

274. The excavation was eventually backfilled, tamped and proper grades and drainage in the area was restored.

275. Water running into the subsidence could be dewatering the nearby wetland area and change its ecosystem.

276. Water could also be washing away support for ME1 pipeline marked on the ME2 project drawings under the subsidence, thus impacting ME1 structural integrity.

277. The excavation did not expose the ME 1 pipeline.[14]

278. The excavation, however, confirmed that authorities considered Mr. Kovarik's concerns valid.

279. For the reasons stated above, Mr. Kovarik was engaged in protected activity as defined by PSIA, 29 C.F.R. §1981.102(a)(1) when he reported his concerns

---

[14] The depth of the excavation has been reported at 2.6 feet by RETEW PG and 3.3 feet by Penn DOT PG relative to the surrounding grades. The ME 1 pipeline is either deeper, or more likely not exactly where it is marked on Defendants ETO/SPLP's project drawings. The conclusion is based on discovery of "a large root mat, interpreted… to be from a sizable tree formerly present at this location." It is unlikely that a "sizable tree would not be removed during the trenching, the only feasible technology during the ME 1 pipeline construction hundred years ago, or that a large tree would be allowed to grow directly above the active ME1 pipeline facility.

about the subsidence enlargement and improper survey to Defendants and subsequently to the authorities.

280. As detailed above, Mr. Kovarik's reports related to numerous violations of permits, environmental laws and pipeline safety violations.

281. Mr. Kovarik's reporting also satisfies numerous factors to be considered pursuant to 49 U.S.C. §60112 whether a pipeline presents a hazard to life, property or the environment as detailed *Supra*.

282. Mr. Kovarik's removal from the site was later justified by email from Mr. Demko suggesting that he violated non-communication policy of the Defendants.

283. When questioned, Ms. Grillo stated that the reasons for Mr. Kovarik's termination will be investigated.

284. Subsequently, Mr. Chris Embry, Defendants ETO/SPLP employee, justified retaliation against Mr. Kovarik by Defendants' need to comply with Construction Management request.

285. Mr. Kovarik's termination latter by Defendant GES blamed his termination on Defendant ETO.

286. Defendants have been pointing fingers at each other or trying to shift liability on another entity, to wit ETO to SPLP.

287. Defendants position statements and motions for summary decisions justified the retaliation against Mr. Kovarik by his frequent violations of ROW/LOD policy and zero tolerance for such violations.

288. Neither the violations, nor explanation why Mr. Kovarik was not terminated earlier if the "zero tolerance or "frequent violations" were true.

289. There have been shifting explanations for Defendants' actions towards Mr. Kovarik.

290. There have been inconsistent applications of defendant policies indicated by Defendants own admissions.

291. There has been hostility and antagonism towards Mr. Kovarik's protected activity.

292. There has been falsity in Defendants' explanations for their actions.

293. There has been change in Defendants attitude towards Mr. Kovarik after he engaged in protected activity.

294. There has been close temporal proximity between Mr. Kovarik's action and adverse consequence.

295. The adverse consequence included removal from the job site followed by termination.

296. Upon information and belief, Mr. Banach started to develop his pretext reasons for removal of Mr. Kovarik when Mr. Kovarik stated that he is concerned about violations of pipeline safety law and why are his concerns exacerbated.

297. Mr. Kovarik's concerns were exacerbated by his knowledge of the Defendant ETO negligence, when it allowed its active gas pipeline to loose integrity and explode in Beaver County due to adverse geological conditions[15].

298. Mr. Kovarik felt that Defendants are again ignoring their duty to authorities and to public, *to wit* act on his subsidence reports in accord with laws and permits, and instead are putting their monetary interests ahead of public safety by rushing the ME2 construction forward.

299. Mr. Kovarik suffered economic injury including but not limited to loss of earnings, loss of fringe benefits, diminished retirement benefits, payment of interest, and medical expenses.

300. Mr. Kovarik, after his termination, was unable to secure a comparable employment elsewhere.

301. Mr. Kovarik suffered from a stigma created by Defendants' wrongful actions.

---

[15] Defendant ETO has been, upon information and belief, fined over thirty million dollars (30,000,000) by DEP and allowed to continue ME 2 construction only after strict permit conditions requiring reporting of any potentially adverse geologic conditions timely to the authorities.

302. Mr. Kovarik suffered damages to his professional reputation due to Defendants' wrongful actions.

303. Mr. Kovarik was unable to continue his legal practice due to Defendants wrongful actions...

304. Mr. Kovarik suffered a medical injury due to Defendants' wrongful actions.

305. Mr. Kovarik suffered a psychological injury due to Defendants' wrongful actions.

306. Mr. Kovarik suffered emotional distress due to Defendants' wrongful actions.

307. Mr. Kovarik suffered mental anguish due to Defendants' wrongful actions.

308. Mr. Kovarik suffered additional pain and suffering due to Defendants' wrongful actions.

309. Mr. Kovarik's average daily earning till his termination was $737.3/day.

310. Mr. Kovarik's daily meal and incidental benefit was $40/day before his termination.

311. Mr. Kovarik life expectancy based on his particular personal situation and several actuaries' tables has been 26.5 years at the time of his wrongful termination.

312. Mr. Kovarik's loss of monthly retirement benefit due to loss of his earnings and pay exceeds $412 monthly.

313. Mr. Kovarik already expended over $ 37.500 on this whistleblowing matter, including but not limited to legal and consulting fees and costs due to defendants wrongful conduct.

314. Defendants' wrongful actions were exclusively originated by Mr. Banach.

315. Defendants' knew that Mr. Banach statements and affidavit are internally inconsistent.

316. Defendants ETO/SPLP did not provide Mr. Kovarik with Mr. Banach's contact information for deposition while listing him as their witness.

317. Defendants ETO/SPLP knew, or should have known that Mr. Banach's statements are untrue.

318. Defendants' positions have not been based on assertions supportable by evidence.

319. Defendants' positions have not been based on plausible interpretation of law.

320. Defendants' positions were aimed at further injuring Mr. Kovarik causing him to abandon his case.

321. Defendants ETO/SPLP have virtually unlimited resources in comparison to ordinary individuals or even medium sized business entities.

322. Defendant' wrongful conduct was facilitated by their virtually unlimited resources.

323. Defendants have been represented by experienced attorneys.

324.  Defendants have been acting in bad faith and/or with gross negligence and in disregard for Mr. Kovarik's and public health and safety.

325.  Defendants' conduct as described above wronged and injured Mr. Kovarik unlawfully to the access of $ 800,000 increasing daily, the exact amount to be proven at trial.

326. Defendants' conduct has been a prima facie example for award of punitive damages in the maximum amount allowable.

WHEREFORE, Jaromir Kovarik respectfully requests that a) a judgment be entered in his favor against the above named Defendants, together with compensatory, equitable liquidated, nominal, treble, punitive and other damages exceeding $ 800,000, the exact amount to be proven at trial, and b) punitive damages to the maximum extent allowed by law to be deposited in an agreed upon trust fund for support and protection of pipeline safety whistleblowers;  c) for any such other and further relief this Court or jury may deem just and proper.

## <u>REQUEST FOR JURY TRIAL</u>

Plaintiff, Mr. Kovarik respectfully requests a trial by jury on all the allowable claims.

Submitted,

This, the 12th day of February 2024

By:   <u>/s/ Jaromir Kovarik, Esq. *pro se*</u>

Jaromir Kovarik,
211 Ridge Rd.
Annville, PA 17003
Tel:  717-383-6985
*Jxk0011@gmail.com*